# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA
# EASTERN DIVISION

| | |
|---|---|
| Rodenburg LLP, doing business as Rodenburg Law Firm, | ) ) ) |
| Plaintiff, | ) **ORDER GRANTING DEFENDANT'S** ) **MOTION FOR SUMMARY** ) **JUDGMENT AND DENYING** |
| vs. | ) **PLAINTIFF'S MOTION FOR** ) **SUMMARY JUDGMENT** ) |
| Certain Underwriters at Lloyd's, London, Syndicate No. 4020, subscribing to Policy Number DCLPLA 00574-00; and The Cincinnati Insurance Company, | ) ) Case No. 3:19-cv-00027 ) ) ) |
| Defendants. | ) ) ) |

Before the Court are cross motions for summary judgment filed by Plaintiff Rodenburg LLP ("Rodenburg" or the "law firm") and Defendant The Cincinnati Insurance Company ("Cincinnati"). Doc. Nos. 46, 52. Defendant Certain Underwriters at Lloyd's, London ("Lloyd's") filed a separate motion for summary judgment on January 8, 2020, which the Court will address after briefing has concluded. Doc. No. 61. Rodenburg filed its initial summary judgment motion on August 30, 2019. Doc. No. 46. Cincinnati responded on September 19, 2019, simultaneously filing a summary judgment motion of its own. Doc. Nos. 52, 56. Rodenburg filed a combined response/reply brief on October 10, 2019, and Cincinnati submitted its final reply on October 24, 2019. Doc. Nos. 58, 60. Rodenburg seeks a judgment declaring that Cincinnati wrongfully denied coverage under an insurance policy, as well as damages for breach of contract. Cincinnati asks for the inverse – a declaration that it properly denied coverage and dismissal of the complaint. For the reasons below, Cincinnati's motion for summary judgment is granted, and Rodenburg's motion is denied.

I.  **BACKGROUND**

Rodenburg is a North Dakota law firm that primarily engages in debt collection. Doc. No. 50, ¶ 1. Cincinnati issued a North Dakota CinciPak Policy ("CinciPak Policy") to Rodenburg effective from May 1, 2015 through May 1, 2018. See Doc. No. 54-2. The CinciPak Policy included Commercial General Liability Coverage ("CGL Policy") and Commercial Umbrella Liability Coverage ("Umbrella Policy"). See id.

The pending motions represent the culmination of an interconnected web of three separate lawsuits. The first is the present action in which Rodenburg seeks a declaration that Cincinnati improperly denied coverage under the Umbrella Policy. Second is an underlying lawsuit against Rodenburg that is the subject of the insurance claim. And third is a debt collection action the law firm pursued that started the chain of litigation.

The dispute traces back to June 2010, when Portfolio Recovery Associates, LLC ("PRA") purchased the rights to a defaulted consumer credit card account. Doc. No. 54-1, ¶ 7. As alleged, an individual named Charlene Williams ("Williams") owed the debt.[1] Doc. No. 1-4, ¶ 10. PRA assigned the account to Rodenburg in January 2011 for collection. Id. When providing the account information to Rodenburg, PRA listed an address in Coon Rapids, Minnesota, that belonged to an individual named Charlene Williams-Mumbo ("Williams-Mumbo"). Id. ¶¶ 10-11. Based on this information, Rodenburg proceeded to commence an action in Minnesota state court, ostensibly against Williams. Id. ¶ 10. However, Rodenburg served the summons and complaint on Williams-Mumbo at the Coon Rapids address. Id. ¶ 11. The Minnesota state court entered a default judgment on December 6, 2011. Doc. No. 54-1, ¶ 20. Williams-Mumbo retained an attorney to

---

[1] Williams' underlying complaint asserts that she never owed the credit card debt. Doc. No. 54-1, ¶ 52. Though the record does not clarify this discrepancy, whether Williams owed the credit card debt does not alter the outcome.

vacate the default judgment, but the attorney did not respond to Rodenburg's inquiries regarding the judgment and apparently withdrew from the representation. Doc. No. 1-4, ¶ 12; Doc. No. 54-1, ¶ 19. Because Williams never received notice of the lawsuit, Rodenburg did not obtain a valid judgment against her.

Attempting to collect on the judgment debt, Rodenburg served a notice of intent to garnish wages at the Coon Rapids address on November 8, 2016. Doc. No. 54-1, ¶ 42. After receiving no response, Rodenburg served Williams' employer with garnishment papers on November 22, 2016. Doc. No. 1-4, ¶ 13. Williams, who had never lived at the Coon Rapids address, learned from her employer that Rodenburg intended to garnish her wages in December 2016. Doc. No. 54-1, ¶¶ 43, 59. Williams subsequently informed Rodenburg of the wrongful garnishment multiple times, first contacting the law firm on December 21, 2016. Doc. No. 1-4, ¶ 14. Williams asserted that she did not owe the debt and had never received notice of the lawsuit or the judgment before the garnishment commenced. Doc. No. 54-1, ¶ 63. Additionally, she filed complaints against Rodenburg with the Minnesota Attorney General's Office and the Consumer Financial Protection Bureau in January 2017. Doc. No. 1-4, ¶ 14. Despite these protests, Rodenburg continued to garnish a total of $656.93 from four of Williams' paychecks between December 29, 2016 and February 9, 2017. Doc. No. 54-1, ¶ 68. Rodenburg determined that Williams was not the judgment debtor later in February 2017, ceasing collection efforts that same month and eventually returning the improperly garnished funds. Id. ¶ 77.

On October 31, 2017, Williams filed suit against Rodenburg in the U.S. District Court for the District of Minnesota. See Doc. No. 54-1. Williams' complaint alleged nine counts, including violations of 15 U.S.C. § 1692, commonly known as the Fair Debt Collection Practices Act ("FDCPA"), as well as various Minnesota statutory and common-law claims. See id. In addition

to the loss of her improperly garnished wages, the injuries Williams claimed included "extreme emotional distress, anxiety, and fear," as well as "confusion, inconvenience, humiliation, embarrassment and annoyance." Id. ¶¶ 88, 91. She also asserted a claim that Rodenburg violated her right of privacy. Id. ¶¶ 140-48.

After Williams filed her lawsuit, Rodenburg sought coverage under the CinciPak Policy. Doc. No. 50, ¶ 5. Cincinnati denied coverage in March 2018, refusing to defend or indemnify Rodenburg under both the CGL Policy and Umbrella Policy. See Doc. No. 54-3. Rodenburg undertook its own defense and ultimately entered into a settlement with Williams in November 2018. Doc. No. 50, ¶ 8. Not long after, Rodenburg filed the present action in North Dakota state court, seeking a declaratory judgment and damages stemming from Cincinnati's denial of coverage. See Doc. No. 1-4. Cincinnati and Lloyd's timely removed the case to federal court on January 30, 2019. See Doc. No. 1.

## II. DISCUSSION

"In a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which

4

may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)). "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

Neither party seriously disputes the facts here. The only question for resolution is whether the Umbrella Policy imposed duties on Cincinnati to defend and indemnify Rodenburg in Williams' lawsuit. The parties agree that North Dakota law governs this question. Accordingly, the Court will apply North Dakota Supreme Court precedent and attempt to predict how that court would decide any state-law questions it has yet to resolve. See Stuart C. Irby Co., Inc. v. Tipton, 796 F.3d 918, 922 (8th Cir. 2015).

"Insurance policy interpretation is a question of law." Forsman v. Blues, Brews & Bar-B-Ques, Inc., 2017 ND 266, ¶ 10, 903 N.W.2d 524 (citing K & L Homes, Inc. v. Am. Family Mut. Ins. Co., 2013 ND 57, ¶ 8, 829 N.W.2d 724). The North Dakota Supreme Court has consistently explained its approach to interpreting insurance policies this way:

> We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract. While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain

5

> the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.

Borsheim Builders Supply, Inc. v. Manger Ins., Inc., 2018 ND 218, ¶ 8, 917 N.W.2d 504 (citation omitted).

The basic task is to determine if the insurance policy's affirmative coverage provisions apply, and if so, to then look at whether any exclusions bar coverage. "It is axiomatic that the burden of proof rests upon the party claiming coverage under an insurance policy." Forsman, 2017 ND 266, ¶ 12, 903 N.W.2d 524 (citation omitted). "If and only if a coverage provision applies to the harm at issue will the court then examine the policy's exclusions and limitations of coverage." Borsheim Builders, 2018 ND 218, ¶ 9, 917 N.W.2d 504 (citation omitted). "While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." Id. ¶ 10 (citation omitted). "Exclusions from coverage . . . must be clear and explicit and are strictly construed against the insurer." Id. ¶ 8 (ellipses in original) (citation omitted).

Rodenburg argues that Williams' lawsuit triggered both a duty to defend and a duty to indemnify. The duties to defend and indemnify "are two separate and distinct contractual obligations . . . determined by applying different standards." Tibert v. Nodak Mut. Ins. Co., 2012 ND 81, ¶ 33, 816 N.W.2d 31 (citing Hanneman v. Cont'l W. Ins. Co., 1998 ND 46, ¶ 39, 575 N.W.2d 445). "While the duty to defend focuses on the complaint's allegations, the duty to indemnify generally is determined by the actual result in the underlying action." Forsman, 2017 ND 266, ¶ 32, 903 N.W.2d 524 (citing Tibert, 2012 ND 81, ¶ 33, 816 N.W.2d 31).

"An insurer's duty to defend is broader than its duty to indemnify." Id. ¶ 31 (citing Farmers Union Mut. Ins. Co. v. Decker, 2005 ND 173, ¶ 13, 704 N.W.2d 857). As a corollary to this

6

principle, if there is no duty to defend, there is no duty to indemnify. See Selective Ins. Co. of Am. v. Smart Candle, LLC, 781 F.3d 983, 985 (8th Cir. 2015) (citations omitted). "An insurer does not have a duty to defend an insured if there is no possibility of coverage under the policy." Decker, 2005 ND 173, ¶ 14, 704 N.W.2d 857 (citing Schultze v. Cont'l Ins. Co., 2000 ND 209, ¶ 8, 619 N.W.2d 510). "When several claims are made against the insured in the underlying action, the insurer has a duty to defend the entire lawsuit if there is potential liability or a possibility of coverage for any one of the claims." Tibert, 2012 ND 81, ¶ 30, 816 N.W.2d 31 (citations omitted). "Any doubt about whether a duty to defend exists must be resolved in favor of the insured." Id. ¶ 31 (citations omitted).

With this foundation in mind, a truncated summary of the CinciPak Policy is useful to frame the issues. Both the CGL Policy and Umbrella Policy provide Rodenburg with insurance for damages resulting from three types of injuries: "bodily injury," "personal and advertising injury," and "property damage." Doc. No. 54-2, p. 22; id. at 70. For coverage to apply, the injuries must result from an "occurrence," meaning for practical purposes, an accident.[2] Id. at 40, 85. Two exclusions are at play as well. The first bars coverage for injuries that Rodenburg "expected or intended" to cause, while the second bars coverage if Rodenburg's conduct violated certain categories of statutes. Id. at 62, 91 (expected or intended injury exclusions); id. at 28, 72 (violation of statutes exclusions). Rodenburg does not dispute the denial of coverage under the CGL Policy, asserting only that Cincinnati improperly denied Umbrella Policy coverage. Doc. No. 1-4, ¶ 23.

---

[2] The Umbrella Policy's definition of an occurrence encompasses intentional torts for personal and advertising injury. Doc. No. 54-2, p. 85.

A.  **Umbrella Policy Applicability**

As an initial roadblock, Cincinnati contends that because it denied Rodenburg Umbrella Policy coverage based on some of the same provisions that it denied CGL Policy coverage, the Umbrella Policy is inapplicable altogether. The Umbrella Policy sets out its threshold requirements as follows:

> **1.** We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" <u>to which this insurance applies</u>:
>
> **a.** Which is in excess of the "underlying insurance"; or
> **b.** <u>Which is either excluded or not insured by</u> "underlying insurance".

Doc. No. 54-2, p. 70 (emphasis added). The Umbrella Policy defines "underlying insurance" as the CGL Policy. <u>Id.</u> at 87. Because the CGL Policy did not cover Rodenburg's liability to Williams, subsection 1.b. is the sole tension point here.

Cincinnati enthusiastically points out that it denied coverage under the CGL Policy and Umbrella Policy based on identical provisions found in both policies – the definition of an occurrence, as well as the violation of statutes and expected or intended injury exclusions. <u>See</u> Doc. No. 54-3. Because Rodenburg did not challenge the denial of CGL Policy coverage, the argument goes, Rodenburg tacitly admitted that the denial of Umbrella Policy coverage was also proper on these same grounds. Cincinnati argues that the Court should not even reach the substantive provisions of the Umbrella Coverage because of this supposed admission. But this approach puts cart before horse.

Indeed, Cincinnati's preferred reading strikes the words "to which this insurance applies" from the Umbrella Policy. As written, the language looks initially to whether the provisions in "this insurance" for bodily injury, personal and advertising injury, or property damage apply. If

8

they do not, or if the Umbrella Policy's own exclusions defeat coverage, then there is no need to continue to subsection 1.b. to consider the CGL Policy at all. Only if the Umbrella Policy does apply is a comparison with the CGL Policy warranted. So rather than a short track to cutting off claims, as Cincinnati sees it, this provision is in reality a back stop that kicks in when the Umbrella Policy would otherwise apply. Adhering to the plain language, the Court will therefore determine whether the Umbrella Policy provides coverage and then compare that coverage with the CGL Policy if necessary.

### B. Bodily Injury, Personal and Advertising Injury, and Property Damage

The inquiry now becomes whether any allegations in Williams' complaint fall within the Umbrella Policy's definitions of bodily injury, personal and advertising injury, or property damage. Taking these terms in turn, bodily injury is defined as "bodily harm or injury, sickness, disease, disability, humiliation, shock, fright, mental anguish or mental injury." Doc. No. 54-2, p. 83. Williams' complaint alleges "extreme emotional distress, anxiety, and fear" and "confusion, inconvenience, humiliation, embarrassment and annoyance." Doc. No. 54-1, ¶¶ 88, 91. These injuries clearly meet the Umbrella Policy's definition for bodily injury, and Cincinnati acknowledges as much. See Doc. No. 53, p. 13 n.1.

Williams' complaint also alleges personal and advertising injury, defined as injuries arising from the commission of certain intentional torts. Doc. No. 54-2, pp. 85-86. Pertinent here, Rodenburg argues that Williams' complaint implicates violation of the right of privacy, malicious prosecution, and defamation. The complaint specifically alleged Rodenburg's conduct violated Williams' right of privacy. Doc. No. 54-1, ¶¶ 140-48. Not included, however, are claims for malicious prosecution and defamation. In Cincinnati's view, the complaint does not trigger the duty to defend for these omitted offenses because they amount to "mere speculation that additional

. . . causes of action may be developed at a later time." Schultze, 2000 ND 209, ¶ 10, 619 N.W.2d 510. Nonetheless, "the duty to defend does not depend on the nomenclature of the claim. Rather, the focus is on the basis for the injury." Nodak Mut. Ins. Co. v. Heim, 1997 ND 36, ¶ 31, 559 N.W.2d 846. The basis for Williams' injuries is that Rodenburg wrongfully instituted a wage garnishment proceeding, informing her employer of that proceeding and eventually terminating it in her favor. This conduct raises the specter of defamation and malicious prosecution claims. See N.D. Cent. Code § 14-02-03 (libel elements); N.D. Pattern Jury Instruction C–13.00 (2019) (malicious prosecution elements). Although Williams did not overtly allege malicious prosecution or defamation, these offenses are not claims that "may be developed at a later time" because the complaint's factual allegations already support them. As a result, Williams' complaint satisfies the Umbrella Policy's definition of personal and advertising injury because it alleges conduct that implicates violation of the right of privacy, malicious prosecution, and defamation.

Less availing, though, is Rodenburg's argument that Williams' complaint alleges property damage. The Umbrella Policy defines property damage as either "[p]hysical injury to or destruction of tangible property" or "[l]oss of use of tangible property that is not physically injured." Doc. No. 54-2, p. 86. Rodenburg characterizes Williams' injury as the loss of the wages in her bank account, while Cincinnati contends the injury is only to Williams' expectancy in receiving those wages. The distinction is immaterial. The North Dakota Supreme Court has yet to decide whether funds in a bank account are tangible or intangible property. Still, the weight of authority holds that bank-account funds are intangible. See Mullin v. Travelers Indem. Co. of Conn., 541 F.3d 1219, 1223 (10th Cir. 2008) (collecting cases describing bank-account funds as intangible property and predicting the Utah Supreme Court would so hold). The Court predicts that the North Dakota Supreme Court would adopt this position. Regardless of whether Williams

suffered an injury to her wages or merely to an expectancy in her wages, the injury would be intangible. Thus, the Umbrella Policy's definition of property damage does not apply to Williams' complaint.

### C. Occurrence Definition and Expected or Intended Injury Exclusion

Williams' claims, as previously established, meet the definitions of bodily injury and personal and advertising injury. Even so, the Umbrella Policy limits coverage to injuries caused by an occurrence:

> **2.** This insurance applies to "bodily injury", "personal and advertising injury" or "property damage" only if:
>
> **a.** The "bodily injury", "personal and advertising injury" or "property damage" is caused by an "occurrence". . . .

Doc. No. 54-2, p. 70. An occurrence is defined as either "[a]n accident . . . that results in 'bodily injury' or 'property damage'" or "[a]n offense that results in 'personal and advertising injury'." Id. at 85. Williams' complaint alleges offenses that resulted in personal and advertising injury. To that extent, Rodenburg has demonstrated that the Umbrella Policy's affirmative coverage provisions apply.

Williams' bodily injury claims, however, require additional consideration. Cincinnati argues Rodenburg intentionally garnished Williams' wages, and her resulting mental and emotional injuries therefore did not stem from an occurrence. Meanwhile, Rodenburg contends it made a mistake in wrongfully garnishing Williams' wages because the law firm believed she was the correct judgment debtor, qualifying as an accident.

As a starting point, the Umbrella Policy does not define "accident." The North Dakota Supreme Court defines the term as "happening by chance, unexpectedly taking place, not according to the usual course of things." K & L Homes, 2013 ND 57, ¶ 11, 829 N.W.2d 724

(quoting Wall v. Penn. Life Ins., 274 N.W.2d 208, 216 (N.D. 1979)). Relevant, too, at this juncture is the Umbrella Policy's expected or intended injury exclusion, precluding coverage for bodily injury and property damage "expected or intended from the standpoint of the insured." Doc. No. 54-2, p. 91. The North Dakota Supreme Court generally views expected or intended injury exclusions and occurrence provisions as one and the same, and so consideration of this exclusion now is appropriate. See Nat'l Farmers Union Prop. & Cas. Co. v. Kovash, 452 N.W.2d 307, 311 n.3 (N.D. 1990).

Coverage is precluded under either the definition of an occurrence or the expected or intended injury exclusion if Rodenburg (1) undertook an intentional act and (2) the resulting injuries were the "natural and probable consequences" of that act. Tibert, 2012 ND 81, ¶ 18, 816 N.W.2d 31. "[I]t is not enough for the insurer to show that the act was intentional and the result was foreseeable. In order to infer intent to injure, the insurer must show the act was done intentionally and was of such a character that harmful consequences 'are substantially certain to result from the act.'" Id. ¶ 20 (citations omitted). Both parties agree that Rodenburg acted intentionally to garnish Williams' wages. The debate is whether harmful consequences were "substantially certain" to follow.

The Eighth Circuit Court of Appeals, applying North Dakota's natural and probable consequences standard, determined that an insurer had no duty to defend under similar circumstances. See First Nat'l Bank and Tr. Co. of Williston v. St. Paul Fire & Marine Ins. Co., 971 F.2d 142, 146 (8th Cir. 1992). In St. Paul Fire, a business owner sought a line of credit from a bank. The bank erroneously sent a commitment letter to the customer indicating the line of credit had been approved. Later, the bank backtracked and told the customer he needed to meet additional conditions to obtain the credit, to which the customer responded that his business would

suffer "serious hardship" if the bank turned him down. Id. at 143. The bank eventually refused to extend the credit, and the customer's business closed. The customer sued for mental and emotional injuries, among others, and the bank's insurer refused to defend. Id. at 143-44.

On appeal after the district court granted summary judgment for the insurer in the ensuing declaratory judgment action, the bank argued that because at least some of its acts were mistakes, including the commitment letter it sent in error, the injuries resulted from an accident. The Eighth Circuit rejected this argument, warning, "Under this approach, any conscious decision that in retrospect appears to have been imprudent may be termed a 'mistake.'" Id. at 145. The court went on to explain that the bank had "specific notice" of the potential harm that would befall the customer's business without the line of credit. Id. at 146. When faced with that information, the bank "made thoughtful choices" in refusing to extend credit that evinced intentional conduct, the natural and probable consequence of which was the business's closing and the customer's concomitant mental and emotional injury. Id. at 145-46. Accordingly, the Eighth Circuit affirmed summary judgment.

Based on the undisputed facts here, Williams' injuries were the natural and probable consequence of Rodenburg's intentional acts. Williams first told the law firm it was wrongfully garnishing her wages on December 21, 2016, and she called several more times to express the same concerns. Doc. No. 1-4, ¶ 14. Added to that, the Minnesota Attorney General's Office and the Consumer Financial Protection Bureau directed Rodenburg to respond to inquiries regarding Williams' complaints. Doc. No. 54-1, ¶¶ 70-71. Yet Rodenburg persisted in garnishing four of her paychecks beginning on December 29, 2016—when the law firm already knew she may not have been the correct judgment debtor. Id. ¶ 68. Presented with information that Williams never lived at the address where the garnishment papers had been sent and never received notice of the

13

lawsuit or the judgment, Rodenburg refused to investigate her claims and continued to garnish her wages anyway. Id. ¶ 64. The only thing that happened unexpectedly was that Williams turned out to be right. Rodenburg's "conscious decision" to garnish her wages "that in retrospect appears to have been imprudent" cannot morph intentional conduct into an accident. St. Paul Fire, 971 F.2d at 145.

More fundamentally, it is the allegations in the complaint that trigger the duty to defend. See Forsman, 2017 ND 266, ¶ 32, 903 N.W.2d 524. Williams' complaint alleges intentional conduct. The pleading is awash in phrases such as "willfully ignored," "intentionally invaded," "intentionally deprived," "intentionally made material misrepresentations"– the list goes on. Doc. No. 54-1, ¶¶ 64, 83, 121-22. Rodenburg appears to argue that because it initially believed Williams to be the correct judgment debtor, all the actions that followed were merely negligent. But this disregards the meat of Williams' complaint. It does not allege a simple mix-up. Instead, the complaint's gravamen, and the basis for Williams' mental and emotional injuries, is that Rodenburg deliberately garnished Williams' wages <u>after</u> it had notice that she was potentially not the judgment debtor.

Further, as Rodenburg acknowledges, garnishing someone's wages ordinarily causes mental distress. See Doc. No. 50, p. 10. Williams even told Rodenburg "she was angry, confused, distressed, and upset" upon finding out the law firm intended to garnish her wages. Doc. No. 54-1, ¶ 65. So, like the bank in St. Paul Fire, Rodenburg possessed "specific notice" of the potential for injury. Rodenburg then made "thoughtful choices" to press on, repeatedly garnishing Williams' wages. The harmful mental and emotional consequences that ensued were substantially certain to result from the law firm's actions. Thus, Rodenburg's conduct is unambiguously

precluded from the Umbrella Policy's coverage because Williams' bodily injury resulted from intentional acts.[3]

### D. Violation of Statutes Exclusion

With Rodenburg's arguments for coverage based on bodily injury and property damage whittled down, only Williams' claims for personal and advertising injury trigger the Umbrella Policy's affirmative coverage provisions. Turning now to the exclusions, the violation of statutes exclusion precludes coverage for the personal and advertising injury Rodenburg caused. The exclusion bars coverage for:

> Any liability arising directly or indirectly out of any action or omission that violates or is alleged to violate:
>
> **a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;
>
> **b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or
>
> **c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

Doc. No. 54-2, p. 72. At issue is whether Rodenburg's alleged violations of the FDCPA invoke this exclusion.

At the outset, the Court finds that the FDCPA is a statute that falls within the exclusion's catch-all subsection 8.c. because it prohibits or limits the communicating of information.[4] For example, 15 U.S.C. § 1692c states that a debt collector "may not communicate" or "shall not

---

[3] The same reasoning would apply to defeat coverage for any injuries Williams sustained from the loss of her wages.

[4] Another district court has found the FDCPA to be a statute that prohibits or limits communicating information under a similar violation of statutes insurance exclusion. See Zurich Am. Ins. Co. v. Ocwen Fin. Corp., 357 F. Supp. 3d 659, 672 (N.D. Ill. 2018).

communicate" debt collection information using specified means; 15 U.S.C. § 1692d prohibits "the use of . . . language the natural consequence of which is to abuse the hearer or reader" in connection with debt collection; and 15 U.S.C. §§ 1692e and 1692f collectively enumerate more than 20 distinct methods of proscribed communication. Williams' complaint alleges Rodenburg violated each of these FDCPA provisions. See Doc. No. 54-1, ¶¶ 95, 100, 104, 108.

Nevertheless, Rodenburg contends that alleged violations of the FDCPA do not qualify under subsection 8.c. for two reasons. First, the law firm argues the FDCPA is dissimilar to the TCPA and the CAN-SPAM Act, so it is not the type of statute to which the exclusion applies. But by its terms, the exclusion is not limited only to statutes similar to the TCPA or the CAN-SPAM Act. Instead, it applies to "[a]ny statute" that meets the criteria in the exclusion's catch-all provision. Doc. No. 54-2, p. 72. Regardless of whether the FDCPA is similar to the exclusion's two enumerated statutes, a question the Court need not reach, it is a statute that independently meets the requirements of the catch-all provision. That is enough to defeat coverage.

The law firm's second contention is that Cincinnati's failure to specifically include the FDCPA in the exclusion either evinces an intent to omit FDCPA violations or at least leaves the exclusion ambiguous. Thus, Rodenburg contends, the exclusion must be construed in favor of coverage. Such an interpretation, however, would prevent the catch-all provision from applying unless a statute is specifically included in the policy language. This, in turn, would then mean that any specifically included statute would no longer fall within the catch-all provision. Rodenburg's proposed construction would therefore render subsection 8.c. perpetually useless. Construing the insurance contract to give meaning and effect to each part, the Court rejects this invited interpretation. See Borsheim Builders, 2018 ND 218, ¶ 8, 917 N.W.2d 504.

As a final effort, Rodenburg asserts that because not all of Williams' claims allege violations of the FDCPA, the other statutory and common-law claims still trigger coverage. But the exclusion says otherwise. The FDCPA, as explained above, qualifies as a statue that prohibits or limits the communicating of information. As a result, the violation of statutes exclusion precludes coverage for "[a]ny liability arising directly or indirectly out of any action" that is alleged to violate the FDCPA. Doc. No. 54-2, p. 72. The North Dakota Supreme Court construes "arising out of" to mean "causally connected with, not 'proximately caused by.'" Norgard v. Nodak Mut. Ins. Co., 201 N.W.2d 871, 875 (N.D. 1972). Rodenburg argues that at least some of Williams' injuries are causally connected to offenses other than the FDCPA violations. While true, liability for those offenses is cut off from coverage because that liability also arises from Rodenburg's alleged violations of the FDCPA. Stated differently, Williams' claims originated from a single course of conduct; because that conduct allegedly violated the FDCPA, all resulting liability—including for non-FDCPA claims—is excluded from coverage. See Nw. G.F. Mut. Ins. Co. v. Norgard, 518 N.W.2d 179, 184 (N.D. 1994); see also Hartford Cas. Ins. Co. v. Gelshenen, 387 F. Supp. 3d 634, 642 (W.D.N.C. 2019).

### III. CONCLUSION

The Umbrella Policy's violation of statutes exclusion bars Williams' claims for personal and advertising injury. The bodily injury claims do not meet the definition of an occurrence and are also precluded under the expected or intended injury exclusion. Finally, Williams' complaint does not state claims that fall within the definition of property damage. As a matter of law, there is no possibility of coverage for any of Williams' claims under the Umbrella Policy. A comparison with the CGL Policy's coverage is consequently unnecessary. The Court concludes that Cincinnati did not have a duty to defend or indemnify Rodenburg in Williams' lawsuit.

No genuine issues of material fact remain, and Cincinnati is entitled to judgment as a matter of law. The Court has carefully reviewed the entire record, the parties' filings, and the relevant case law. For the reasons above, Cincinnati's motion for summary judgment (Doc. No. 52) is **GRANTED**. Rodenburg's motion for summary judgment (Doc. No. 46) is **DENIED**. The complaint against Cincinnati is hereby **DISMISSED WITH PREJUDICE**. Considering the comprehensive briefing, Cincinnati's motions for hearing (Doc. Nos. 55, 57) are **DENIED**.

**IT IS SO ORDERED**.

Dated this 9th day of January, 2020.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court