# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA
# EASTERN DIVISION

| | |
|---|---|
| Rodenburg LLP, doing business as Rodenburg Law Firm, ) ) ) | |
| Plaintiff, ) ) ) | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| vs. ) ) ) | |
| Certain Underwriters at Lloyd's, London, Syndicate No. 4020, subscribing to Policy Number DCLPLA 00574-00; and The Cincinnati Insurance Company, ) ) ) ) ) ) | Case No. 3:19-cv-00027 |
| Defendants. ) | |

Before the Court is Defendant Certain Underwriters at Lloyd's, London's ("Lloyd's") motion for summary judgment filed on January 8, 2020. Doc. No. 61. The motion seeks dismissal of Plaintiff Rodenburg LLP's ("Rodenburg" or the "law firm") complaint, which asserts that Lloyd's wrongfully denied coverage under an insurance policy. On January 30, 2020, Rodenburg responded in opposition to the motion. Doc. No. 71. Lloyd's filed a reply on February 14, 2020. Doc. No. 83. For the reasons below, the motion is granted.

## I.     BACKGROUND

Rodenburg is a North Dakota law firm that primarily engages in consumer debt collection. Doc. No. 1-4, ¶ 4. Lloyd's is a New York insurance carrier. Id. ¶ 2. A summary of the Policy is followed by the factual background and procedural history.

### A.     The Policy

Lloyd's issued a Lawyers Professional Liability Insurance Policy ("Policy") to Rodenburg effective from May 10, 2017 through May 10, 2018. Doc. No. 63-6, p. 5. The Policy's retroactive date is May 10, 2009. Id. In relevant part, the Policy provides:

> THIS IS A CLAIMS MADE AND REPORTED INSURANCE POLICY. COVERAGE IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST [RODENBURG] AND REPORTED TO [LLOYD'S] DURING THE POLICY PERIOD.
>
> * * *
>
> [Lloyd's] agree[s] to pay on behalf of [Rodenburg], all sums which [Rodenburg] may be legally obligated to pay as Damages to others, up to the Limit of Liability, resulting from:
>
> 1. A Claim seeking Damages caused by a negligent act, error or omission in Professional Services provided by, or that should have been provided by [Rodenburg] or any person for whose acts [Rodenburg], as a lawyer or notary public, is legally responsible;
>
> 2. A Claim seeking Damages for Personal Injury arising from the Professional Services of [Rodenburg].
>
> The Claim must be made against [Rodenburg] during the Policy Period.  The Claim must be based on an Incident that wholly occurs on or after the Retroactive Date. [Rodenburg] must provide written notification to [Lloyd's] of the Claim while this Insurance Policy is in effect.
>
> In addition, [Lloyd's] will cover Claims arising from Incidents as follows:
>
> 1. Prior Incidents: [Lloyd's] will cover Claims arising from an Incident that occurred before the Effective Date of this Insurance Policy if the following conditions are met:
>
>    a. [Rodenburg] did not have knowledge of the Incident prior to the Effective Date of this Insurance Policy;
>
>    b. [Rodenburg] was not aware of any Incident which could reasonably be expected to the basis for a Claim; and
>
>    c. The Claim results from an Incident which occurred on or after the Retroactive Date and is reported to [Lloyd's] while this agreement is in effect.

<u>Id.</u> at 9.  The Policy defines a "Claim" as "a demand received by [Rodenburg] for money or services including the service of Suit."  <u>Id.</u> at 13.  An "Incident" is defined as "any circumstance,

act, error or omission which [Rodenburg] could reasonably expect to be the basis of a Claim or Suit covered by this Insurance Policy." Id. at 14.

### B.   Factual Background

The current lawsuit traces back to June 2010, when Portfolio Recovery Associates, LLC ("PRA") purchased the rights to a defaulted consumer credit card account from HSBC Bank Nevada, N.A.  Doc. No. 82-6, p. 41.  The account linked to a Best Buy consumer credit card with a $1,481.10 unpaid balance.  Id. at 36.  As alleged, an individual named Charlene Williams ("Williams") owed the debt.  Doc. No. 1-4, ¶ 10.  Williams admitted to filling out the application for the Best Buy card on May 9, 2005 and acknowledged that the address, social security number, driver's license number, date of birth, and phone number on the application matched her information.[1]  Doc. No. 78 at 67:23-69:14.  The application listed an address on Pillsbury Street in Minneapolis, Minnesota, that Williams resided at in 2005.  Doc. No. 82-1.

PRA assigned the account to Rodenburg in January 2011 for collection.  Doc. No. 63-7, ¶ 10.  When providing the account information to Rodenburg, PRA listed an address on Crocus Street in Coon Rapids, Minnesota.  Doc. No. 82, ¶ 11.  Unknown to Rodenburg, the Coon Rapids address belonged to an individual named Charlene Williams-Mumbo ("Williams-Mumbo").  Doc. No. 63-1, p. 2.  Based on the information PRA provided, Rodenburg proceeded to commence an action in Minnesota state court, ostensibly against Williams.  Doc. No. 82, ¶ 13.  Rodenburg served the summons and complaint, however, at the Coon Rapids address.  Id.  The Minnesota state court entered a default judgment on December 6, 2011.  Id. ¶ 14.  An attorney, Daniel York, contacted

---

[1] Williams maintained that she did not owe the debt throughout her interactions with Rodenburg. That said, she provided conflicting reasons.  At times she claimed identify theft and at others asserted that she had paid off the balance on her Best Buy card, that she had a different type of account, or that her credit limit was too low to owe the $1,481.10 amount.  See Doc. No. 82, ¶¶ 20-21.  Whether Williams actually owed the debt is ultimately immaterial to the outcome.

3

Rodenburg to vacate the default judgment shortly after, but he never responded to the law firm's follow-up inquiries.  See Doc. No. 84-1.

Fast forwarding to November 8, 2016, PRA relayed information to Rodenburg that Williams had secured employment with US Foods.  Doc. No. 84, ¶ 17.  Rodenburg served a notice of intent to garnish wages at the Coon Rapids address two days later.  Doc. No. 63-7, ¶ 41.  Receiving no response, Rodenburg then served US Foods with garnishment papers on November 22, 2016.  Doc. No. 84, ¶ 17.  Williams discovered Rodenburg had garnished her wages in December 2016 when reviewing her paycheck.  Doc. No. 78 at 85:11-86:14.

By pure coincidence, on December 16, 2016, a representative from a title company called Rodenburg to inquire about the default judgment on Williams-Mumbo's behalf.  Doc. No. 63-1, p. 2.  A fax from the title company sent to Rodenburg later that day confirmed that Williams-Mumbo resided at the Coon Rapids address.  Doc. No. 82-4.  Rodenburg informed the title company that Williams-Mumbo's social security number did not match the Best Buy cardholder's social security number.  Doc. No. 63-1, p. 2.

After learning Rodenburg had garnished her wages, Williams first contacted the law firm on December 21, 2016.  Doc. No. 82, ¶ 20.  Initially, Williams denied owing Best Buy the amount claimed but stated it was "fine" that Rodenburg had garnished her wages because the work at US Foods was "too hard" and that she planned to quit anyway.  Doc. No. 63-1, p. 3.  She subsequently called the law firm several more times that same day, becoming increasingly distraught.  Doc. No. 82, ¶ 21.  Williams more forcefully denied owing the debt, denied that she had ever lived at the Coon Rapids address, and denied that she had received notice of the lawsuit or the judgment before garnishment commenced.  Doc. No. 63-7, ¶ 63.  She verbally requested that Rodenburg return her

4

garnished wages during numerous phone calls between December 2016 and February 2017. See Doc. No. 63-1, pp. 3-4.

In at least one phone call, Rodenburg attempted to apprise Williams that York represented her in the matter. Doc. No. 78 at 92:20-93:15. But Williams denied hiring or knowing York. Id. at 93:16-18. On her own initiative, Williams then contacted York in late December 2016. Id. at 93:18-21. York confirmed that he had represented a different person named Charlene Williams in 2011 regarding the default judgment. Doc. No. 63-7, ¶ 69. The person he represented was Caucasian, while Williams is African-American. Doc. No. 78 at 97:25-98:15.

At the beginning of 2017, Williams filed complaints against Rodenburg with the Minnesota Attorney General's Office and the Consumer Financial Protection Bureau ("CFPB"). Doc. No. 82-6, pp. 10, 71. In addition to seeking information about the credit card debt, Williams' complaints stated, "I request that all my wages that [have] been garnished be refunded and the harassment and [defamation] of character be stopped." Id. at 8. Rodenburg responded to the complaints by claiming that the law firm had positively identified Williams as the judgment debtor. Id. at 55-56. Despite Williams' continued protests, Rodenburg garnished a total of $656.93 from four of her paychecks between December 29, 2016 and February 9, 2017. Doc. No. 63-7, ¶ 68.

Upon further investigation, PRA and Rodenburg decided on February 16, 2017 to terminate the wage garnishment, vacate the judgment, and dismiss the underlying lawsuit. Doc. No. 63-1, p. 3. Rodenburg partner Eeva Wendorf conveyed the decision to Williams during a phone call later that day. Id. at 4. At that point, Williams stated that she considered the matter resolved. Id.

Reentering the picture one final time, York sent a letter to Rodenburg after Williams contacted him. Doc. No. 84-3. The law firm received the letter on March 1, 2017.[2] Id. York wrote, "I think you need to take a serious look at your file because I have referred the Charlene Williams you are now going after to attorney Todd Murray for the horrible way she has been treated and ignored during your collection efforts on the wrong person." Id. In reaction, Wendorf sent an email marked with high importance to Rodenburg's partners the next day with the subject line: "Charlene Williams – 106883 – ltr from york. Possible lawsuit against us. Please review." Doc. No. 63-4. Wendorf stated in the email, "We may have to deal with a threat of suit or suit from attorney Todd Murray." Id. She also wrote, "As soon as I saw this file after [Clifton Rodenburg] sent the second letter from the AG to me, I knew it was going to be [a] bomb." Id.

Also on March 1, 2017, Williams spoke with Rodenburg attorney Anita Sunde. Doc. No. 63-1, p. 4. Williams expressed dissatisfaction and confusion with Rodenburg's response to her initial CFPB complaint.[3] Id. In addition, she explained that Rodenburg had yet to return her wages. Id. Sunde responded that Rodenburg never took possession of her wages. Id. Instead, US Foods placed a garnishment hold on the wages, and a third-party servicer held the funds in anticipation of an eventual transfer to Rodenburg. Id. The next day, Sunde notified Williams that she had contacted US Foods to expedite return of the wages. Doc. No. 82, ¶ 26. Once again, Williams stated that she considered the matter resolved. Id. Williams also told Sunde that she would recant her complaints sent to the Minnesota Attorney General's Office and the CFPB. Id.

---

[2] York dated the letter February 13, 2017 and postmarked it on February 23, 2017. See Doc. No. 84-3.

[3] The CFPB allows debt collectors a set of predetermined resolution options when responding to a consumer complaint. Doc. No. 63-9 at 33:9-21. Rodenburg selected "nonmonetary relief" for Williams' first complaint, and she received the response after Wendorf promised the return of her wages. Doc. No. 82-6, p. 81.

6

US Foods returned Williams' wages later in March 2017, and Rodenburg vacated the judgment the following month. Doc. No. 63-1, pp. 4-5.

On October 31, 2017, Williams filed suit against Rodenburg and PRA in the U.S. District Court for the District of Minnesota.[4] Doc. No. 63-7. Williams' complaint alleged nine counts, including violations of 15 U.S.C. § 1692, commonly known as the Fair Debt Collection Practices Act ("FDCPA"), as well as various Minnesota statutory and common-law claims. Id. Rodenburg reported Williams' lawsuit to Lloyd's on December 18, 2017. Doc. No. 63-8, p. 4. On January 18, 2018, Lloyd's denied coverage. Id. at 1. Rodenburg undertook its own defense and entered into a settlement with Williams in November 2018. Doc. No. 1-4, ¶ 9.

Rodenburg filed the present action in North Dakota state court on January 17, 2019, seeking a declaratory judgment and damages stemming from the denial of coverage. Doc. No. 1. On January 30, 2019, the Defendants[5] timely removed the case to federal court. Id.

## II. LEGAL STANDARD

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v.

---

[4] Williams apparently contacted Murray, a consumer rights attorney, regarding Rodenburg's conduct. Doc. No. 78 at 99:13-100:10. Murray declined the representation but referred Williams to Adam Strauss, the attorney who represented her in the underlying lawsuit in the District of Minnesota. Id.

[5] The Court previously granted a separate summary judgment motion that dismissed The Cincinnati Insurance Company as a Defendant. Doc. No. 64.

Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)). "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

The parties agree North Dakota law controls. Accordingly, the Court will apply North Dakota Supreme Court precedent and attempt to predict how that court would decide any state-law questions it has yet to resolve. See Stuart C. Irby Co., Inc. v. Tipton, 796 F.3d 918, 922 (8th Cir. 2015).

"Insurance policy interpretation is a question of law." Forsman v. Blues, Brews & Bar-B-Ques, Inc., 2017 ND 266, ¶ 10, 903 N.W.2d 524 (citing K & L Homes, Inc. v. Am. Family Mut. Ins. Co., 2013 ND 57, ¶ 8, 829 N.W.2d 724). The North Dakota Supreme Court has consistently explained its approach to interpreting insurance policies this way:

> We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract. While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain

8

> the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.

Borsheim Builders Supply, Inc. v. Manger Ins., Inc., 2018 ND 218, ¶ 8, 917 N.W.2d 504 (citation omitted). The basic task is to determine if the insurance policy's affirmative coverage provisions apply, and if so, to then look at whether any exclusions bar coverage. "It is axiomatic that the burden of proof rests upon the party claiming coverage under an insurance policy." Forsman, 2017 ND 266, ¶ 12, 903 N.W.2d 524 (citation omitted). "If and only if a coverage provision applies to the harm at issue will the court then examine the policy's exclusions and limitations of coverage." Borsheim Builders, 2018 ND 218, ¶ 9, 917 N.W.2d 504 (citation omitted).

The complaint avers that Williams' lawsuit triggered both a duty to defend and a duty to indemnify. The duties to defend and indemnify "are two separate and distinct contractual obligations . . . determined by applying different standards." Tibert v. Nodak Mut. Ins. Co., 2012 ND 81, ¶ 33, 816 N.W.2d 31 (citing Hanneman v. Cont'l W. Ins. Co., 1998 ND 46, ¶ 39, 575 N.W.2d 445). "An insurer's duty to defend is broader than [the] duty to indemnify." Id. ¶ 30 (citing Farmers Union Mut. Ins. Co. v. Decker, 2005 ND 173, ¶ 14, 704 N.W.2d 857). Corollary to that principle, if there is no duty to defend, there is no duty to indemnify. See Selective Ins. Co. of Am. v. Smart Candle, LLC, 781 F.3d 983, 985 (8th Cir. 2015) (citations omitted). "An insurer does not have a duty to defend an insured if there is no possibility of coverage under the policy." Decker, 2005 ND 173, ¶ 14, 704 N.W.2d 857 (citing Schultze v. Cont'l Ins. Co., 2000 ND 209, ¶ 8, 619 N.W.2d 510). "Any doubt about whether a duty to defend exists must be resolved in favor of the insured." Tibert, 2012 ND 81, ¶ 31, 816 N.W.2d 31 (citations omitted).

### III. **DISCUSSION**

Lloyd's advances two independent arguments in support of summary judgment. According to Lloyd's, coverage is precluded because: (1) Williams first made her claim against Rodenburg before May 10, 2017 (the effective date of the Policy), and (2) even if Williams first made her claim during the policy period, Rodenburg knew of the circumstances that led to her claim prior to May 10, 2017 and could have reasonably expected a resulting lawsuit. Assuming without deciding that Williams first made her claim during the policy period, the Court agrees with the second contention.

Before examining coverage, though, a threshold issue demands attention. Namely, Rodenburg argues that the Policy's language for claims arising from incidents is ambiguous. At a foundational level, the Policy professes to cover claims based on incidents occurring on or after May 10, 2009 that are first made against Rodenburg and reported to Lloyd's between May 10, 2017 and May 10, 2018. Doc. No. 63-6, p. 9. But the Policy then goes on to state: "In addition, [Lloyd's] will cover Claims arising from Incidents as follows. . . ." Id. Trying to paint this provision as ambiguous, Rodenburg contends that the introductory clause creates additional coverage for claims arising from incidents rather than a limitation on coverage. Relying on that perceived ambiguity and the resulting inconsistency with the remainder of the Policy, Rodenburg asserts that the Court should essentially strike the ensuing language that sets the coverage terms for claims arising from prior incidents.

Ambiguity in an insurance policy "exists when the language can be reasonably construed as having at least two alternative meanings." Wisness v. Nodak Mut. Ins. Co., 2011 ND 197, ¶ 13, 806 N.W.2d 146 (cleaned up). Applying equivalent Minnesota law, the Eighth Circuit Court of Appeals has explained:

> In deciding whether an ambiguity truly exists, however, a policy must be read as a whole. The language must be considered within its context, and with common sense. If a phrase is subject to two interpretations, one reasonable and the other unreasonable in the context of the policy, the reasonable construction will control and no ambiguity exists.

3M Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 858 F.3d 561, 566 (8th Cir. 2017) (internal citations and quotation marks omitted). "It is not permissible to lift one sentence from a policy and try to attach a particular meaning to that sentence standing alone." 2 Lee R. Russ et al., Couch on Insurance § 21:19 (3d ed. 1995).

To be sure, Rodenburg is correct that the introductory clause—when isolated from the rest of the Policy—is amenable to two different interpretations. On one hand, the phrase "[i]n addition, [Lloyd's] will cover Claims arising from Incidents as follows" might indicate coverage beyond that provided by the immediately preceding language. Doc. No. 63-6, p. 9. On the other, the same phrase could evince that additional conditions for coverage apply when a claim arises from an incident. But when that language is considered in the context of the Policy as a whole, only the latter interpretation makes sense. Rodenburg demonstrates in its own brief the absurd results that follow if the introductory clause is interpreted to provide additional coverage. Specifically, Rodenburg points out that the supposed additional coverage would actually afford narrower coverage, sapping all meaning from that section of the Policy. Doc. No. 71, pp. 14-16. The interpretation Lloyd's proffers, meanwhile, is consistent with the purposes of claims made and reported policies generally while also giving meaning and effect to each clause. The Policy therefore unambiguously requires claims arising from incidents to comply with the enumerated additional conditions for coverage.

With that resolved, all agree that Williams' lawsuit arose from events occurring prior to May 10, 2017. Coverage is accordingly contingent on three conditions:

11

>   1. Prior Incidents: [Lloyd's] will cover Claims arising from an Incident that occurred before the Effective Date of this Insurance Policy if the following conditions are met:
>
>       a. [Rodenburg] did not have knowledge of the Incident prior to the Effective Date of this Insurance Policy;
>
>       b. [Rodenburg] was not aware of any Incident which could reasonably be expected to the basis for a Claim; and
>
>       c. The Claim results from an Incident which occurred on or after the Retroactive Date and is reported to [Lloyd's] while this agreement is in effect.

Doc. No. 63-6, p. 9. The Court need only consider the first condition here. With the relevant definitions included, that condition bars coverage if Rodenburg had knowledge of the circumstance, act, error, or omission which could reasonably have been expected to form the basis of Williams' lawsuit. See id. at 9, 13-14.

Although there is a dearth of North Dakota case law construing similar policy language, federal courts typically employ a hybrid subjective-objective test most prominently articulated in Colliers Lanard & Axilbund v. Lloyds of London, 458 F.3d 231 (3d Cir. 2006). The Colliers test encompasses two parts. The first part looks to whether the insured had subjective awareness of an act, error, or omission. Id. at 237. If so, then the second part calls for an objective inquiry to determine "whether a reasonable professional in the insured's position might expect a claim or suit to result." Id. Under this second prong, the insured's subjective expectation of a lawsuit is irrelevant. Id.

In application, Rodenburg indisputably possessed subjective awareness of the acts that led to Williams' lawsuit before May 10, 2017. Rodenburg served the summons and complaint in the original collection lawsuit, as well as the November 2016 garnishment notice, at the Coon Rapids address that turned out to belong to Williams-Mumbo. The law firm then proceeded to garnish

12

Williams' wages between December 2016 and February 2017. During that time, Rodenburg fielded numerous calls from Williams regarding the wrongful garnishment. Rodenburg also responded to Williams' complaints sent to the Minnesota Attorney General's Office and the CFPB. Beyond interactions with Williams, the law firm received information from both the title company and York indicating that Rodenburg failed to obtain a valid judgment against Williams before garnishing her wages. Thus, the first prong of the Colliers test is satisfied.

So too for the second prong. In deposition testimony, Rodenburg acknowledged that the FDCPA imposes strict liability on debt collectors for "any error, even unintentional." Doc. No. 63-9 at 43:2-12. The law firm further conceded that wrongful wage garnishment supplies a basis for an FDCPA claim. Id. at 39:9-15. In light of that, York's March 1, 2017 letter is all but dispositive. York overtly informed Rodenburg that he had referred Williams to a consumer rights attorney "for the horrible way she has been treated and ignored during your collection efforts on the wrong person." Doc. No. 84-3. Williams' statement to Sunde the next day that she considered the matter resolved and her accompanying commitment to recant her regulatory complaints is of no consequence. By that time, Rodenburg knew of the facts that supported Williams' FDCPA claim and knew that York had referred her to a consumer rights attorney. Wendorf's March 2, 2017 email to Rodenburg's partners underscores that reality. Her email explicitly stated, "We may have to deal with a threat of suit or suit from attorney Todd Murray." Doc. No. 63-4. And Wendorf colorfully exclaimed that she knew Williams' file "was going to be [a] bomb" upon reviewing an earlier letter from the Minnesota Attorney General's Office. Id. Most importantly, that email came after the law firm believed that Williams considered the matter resolved following Wendorf's February 16, 2017 phone conversation with her. Rodenburg's own words demonstrate that a reasonable attorney could have expected a claim to result from garnishing Williams' wages.

As a last effort, Rodenburg contends that it could not have expected Williams' claim because no one else who had filed regulatory complaints against the law firm later filed suit.[6] But that reasoning is flawed; correlation does not equal causation. The resolution of unrelated regulatory complaints plainly has no bearing on Williams' unique situation. Faced with the circumstances presented here, a reasonable attorney in Rodenburg's position could have expected a claim. Because Rodenburg possessed subjective awareness of acts that could have reasonably been expected to result in Williams' lawsuit prior to May 10, 2017, there is no possibility of coverage under the Policy.

## IV. CONCLUSION

No genuine issues of material fact remain, and Lloyd's is entitled to judgment as a matter of law. The Court has reviewed the record, the parties' filings, and the relevant legal authority. For the reasons above, the motion for summary judgment (Doc. No. 61) is **GRANTED**. The complaint is hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated this 24th day of June, 2020.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

---

[6] Between January 1, 2014 and February 17, 2020, a total of 62 regulatory complaints were filed against Rodenburg. Doc. No. 82, p. 3.